**LEVI & KORSINSKY LLP**
Eduard Korsinsky (EK-8989)
235 Main Street
Hackensack, New Jersey 07601
Tel.: (973) 265-1600
Fax: (212) 363-7171
Email: ek@zlk.com

*Counsel for Lead Plaintiff Gilad Wirguin*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| STEPHEN MEIER, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CHECKPOINT SYSTEMS, INC., GEORGE BABICH, JR., JEFFERY O. RICHARD AND JAMES M. LUCANIA,<br>Defendants. | Case No. 1:15-cv-08007-RBK-KMW<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Lead Plaintiff Gilad Wirguin ("Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint") the following upon knowledge with respect to his own acts, and upon

facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Checkpoint Systems, Inc. ("Checkpoint" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Checkpoint's public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the Internet.

Lead Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons who purchased or otherwise acquired Checkpoint securities between March 5, 2015 and November 3, 2015, inclusive (the "Class Period"), seeking to recover damages for violations of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Throughout the Class Period, Defendants provided investors with material information concerning, among other things, the Company's earnings-per-

share. Defendants and investors alike used this information to evaluate the financial and operational strength of the Company. For example, on May 10, 2015, during the Company's earnings conference call for the quarter ended March 29, 2015, Checkpoint's Chief Executive Officer, defendant Goerge Babich Jr., alleviated investor concerns by emphasizing the strength of Checkpoint's earnings-per-share:

> Despite lower revenue driven by unprecedented strengthening of the U.S. dollar and the sunset of our large 2014 EAS hardware projects, **we were able to keep our non-GAAP adjusted diluted earnings per share flat, at $0.04**. We're working hard on the execution of our long-term strategic growth initiatives and working equally hard to secure our next significant equipment rollout.

Defendants also relied upon the Company's earnings-per-share to provide guidance to investors and analysts. Earnings-per-share was a material figure to Defendants, or so it seemed.

3. On November 3, 2015, Checkpoint announced that it discovered a material weakness within its internal controls while preparing the Company's financial statements for the third quarter of fiscal 2015. Checkpoint described the material weakness as an inability to maintain effective controls over the accounting for the Company's quarterly tax calculations. As a result of the accounting errors, Checkpoint restated, among other items, the Company's income tax expense, net loss, and net loss per common share as follows:

| ***Quarter Ended Mar. 29, 2015*** | **Reported** | **Restated** |
|---|---|---|
| *Income Tax Expense* | 71,000 | 1,885,000 |
| *Net Loss* | (745,000) | (2,559,000) |
| *Net Loss Per Common Share* | (0.02) | (0.06) |
| ***Quarter Ended Jun. 28, 2015*** | | |
| *Income Tax Expense* | 698,000 | 3,387,000 |
| *Net Loss* | (5,407,000) | (9,492,000) |
| *Net Loss Per Common Share* | (0.13) | (0.22) |

4. The following day, on November 4, 2015, the Company held an earnings conference call with investors to discuss the Company's financial earnings for the third quarter of fiscal 2015. It was at this time that investors learned that the Company's failure to properly account for its tax expense had been an ongoing problem and would continue to be an ongoing problem given the complexity of the Company's tax issues. Significantly, given that the Company's tax expense directly impacted its earnings-per-share, Defendants told investors that earnings-per-share was not a "valuable metric with which analysts can evaluate [Checkpoint's] current or future business performance."

5. Investors reacted promptly to Checkpoint's announcements. In response to the Company's disclosures, Checkpoint's stock price declined sharply from $7.70 on November 3, 2015 to $5.97 on November 4, 2015, a drop of approximately 22% on unusually heavy trading volume.

6. As a result of the defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9. Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. §1391(b), as defendant has its principal executive offices located in this District and a significant portion of the defendants' business, actions, and the subsequent damages, took place within this District.

10. In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

11. Lead Plaintiff Gilad Wirguin purchased Checkpoint securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the defendants' fraud. Lead Plaintiff filed his certification evidencing his transactions previously with the Court in connection with his motion for

appointment as Lead Plaintiff. Lead Plaintiff's certification is incorporated herein by reference.

12. Defendant Checkpoint is incorporated under the laws of Pennsylvania and its principle executive offices are located at 101 Wolf Drive, PO Box 188, Thorofare, New Jersey. The Company's common shares trade on the NYSE under the ticker symbol "CKP" and, as of February 26, 2016, there were 41,494,015 shares of Checkpoint common stock outstanding

13. Defendant George Babich, Jr. ("Babich") is the Company's Chief Executive Officer ("CEO") and President. Babich has been CEO of the Company since February 2013 and was interim President and CEO between May 2012 and February 2013.

14. Defendant James M. Lucania ("Lucania") is the Company's Chief Financial Officer ("CFO") and has been since November 10, 2015. Lucania served as Checkpoint's acting CFO between March 23, 2015 and November 9, 2015.

15. Defendant Jeffrey O. Richard ("Richard") was CFO of the Company until March 23, 2015.

16. The defendants referenced above in Paragraphs 13-15 are sometimes referred to herein as the "Individual Defendants." Checkpoint together with the Individual Defendants are referred to herein as the "Defendants."

17. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Checkpoint's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18. Checkpoint is liable for the acts of Babich, Lucania, and Richard, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful act complained of herein were carried out within the scope of their employment with authorization.

19. The scienter of Babich, Lucania and Richard, and other employees and agents of the Company are similarly imputed to Checkpoint under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### A. Background

20. Checkpoint provides loss prevention, inventory management, and labeling solutions to the retail and apparel industries. The Company's product solutions are primarily in the form of radio frequency devices that help retailers reduce "shrink" (*i.e.*, employee theft or shoplifting). Checkpoint also provides radio frequency products that allow retailers and manufacturers to track their products through the supply chain.

21. Checkpoint operates in 27 countries across three segments—Merchandise Availability Solutions (MAS), Apparel Labeling Solutions (ALS), and Retail Merchandising Solutions (RMS). The MAS segment is comprised primarily of Checkpoint's radio frequency devices for loss prevention. ALS includes the Company's radio frequency identification label business and its data management platform offerings. Checkpoint's RMS segment includes hand-held labeling applications. For fiscal 2014, Checkpoint's MAS, ALS, and RMS segments accounted for 67%, 26%, and 7% of the Company's revenue, respectively. Checkpoint's revenue for fiscal 2014 was $662,040,000.

22. In addition to monitoring the revenue generated by its three different business segments, the Company also keeps track of the revenue it receives from various geographic locations. For fiscal 2012, 2013, and 2014, Checkpoint's revenue came from the following geographic locations:

| (amounts in thousands) | United States, Puerto Rico, & Dominican Republic | Europe | International Americas | Asia Pacific | Total |
|---|---|---|---|---|---|
| **2014** | | | | | |
| Net revenues | $191,037 | $247,413 | $ 27,078 | $196,512 | $662,040 |
| **2013** | | | | | |
| Net revenues | $203,171 | $255,610 | $ 32,523 | $198,434 | $689,738 |
| **2012** | | | | | |
| Net revenues | $184,905 | $276,028 | $ 37,131 | $191,856 | $689,920 |

23. As indicated above, Checkpoint generates substantial amounts of revenue from foreign countries (approximately 71% according to Checkpoint). This requires Checkpoint to take special accounting precautions with respect to its foreign-generated revenue. For example, Checkpoint stated in the 2014 Form 10-K that "[v]olatility in currency exchange rates and interest rates may adversely affect [the Company's] financial condition, results of operations or cash flows. . . . We monitor these exposures as an integral part of our overall risk management program."

24. Checkpoint also stated in the 2014 Form 10-K that "there is a risk that tax authorities will disagree with [Checkpoint's] tax positions" given the Company's "relatively complex tax structure" as a "global business." Checkpoint represented

that it had measures in place to ensure proper tax accounting, such as "record[ing] a valuation allowance to reduce [the Company's] deferred tax assets to the amount that is more likely than not to be realized." "[The Company's] assessments about the realizability of [Checkpoint's] deferred tax assets are based on estimates of our future taxable income by tax jurisdiction, the prudence and feasibility of possible tax planning strategies, and the economic environments in which we do business." The Company's valuation allowance varied dramatically from year to year—for fiscal 2010 through fiscal 2014, the Company's valuation allowance benefit (expense) was ($4.3 million), ($47.7 million), ($0.3 million), $0.1 million, and ($11.3 million), respectively.

**B. Management's Responsibility for Financial Reporting**

25. Defendants represented in each of Checkpoint's periodic reports filed with the SEC on Forms 10-K and 10-Q that the financial statements therein conformed with generally accepted accounting principles ("GAAP").

26. GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. GAAP are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups that it established, the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"),

and the Financial Accounting Standards Board (the "FASB"). Effective July 1, 2009, the FASB issued the FASB Accounting Standards Codification ("ASC") which superseded all prior FAS Standards and FASB Staff Positions regarding FAS Standards. The ASC is "the source of authoritative [GAAP] recognized by the FASB to be applied by nongovernmental entities." (ASC, Topic 105, Sub-topic 10, § 5, ¶ 1.)

27. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

28. Senior management is responsible for a company's financial reporting. The Code of Professional Conduct developed by the American Institute of Certified Public Accounts states in pertinent part:

> The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. Management is responsible for adopting sound accounting policies and for establishing and maintaining an internal control structure that will, among other things, record, process, summarize, and report financial data that is consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, the

> fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

(1 CCH AICPA Professional Standards, SAS No. 1, § 110.02 (1982).)

29. Section 13 of the Exchange Act confirms management's responsibilities for an entity's internal controls. "Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall- . . . devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that- . . . transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements . . . ." (15 U.S.C. § 77m(b)(2)(B)(ii)(I).)

30. Checkpoint's management, including the Company's CEO and CFO, conducted evaluations of the effectiveness of Checkpoint's internal control over financial reporting based on the framework in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO Report"). The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. The

term "reliable" as used in the COSO Report requires that financial statements prepared for external purposes are fairly presented in conformity with GAAP and regulatory requirements. Inherent in the fair presentation of financial statements is the concept of statement materiality. Reliability of financial reporting applies to published financial statements, including interim and consolidated financial statements, and selected financial data, such as earnings releases, derived from these financial statements.

31. An error in previously issued financial statements is an "error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of [GAAP], or oversight or misuse of facts that existed at the time the financial statements were prepared." A "retrospective application" is the "application of a different accounting principle to one or more previously issued financial statements . . . ." A "restatement" is the "process of revising previously issued financial statements to reflect the correction of an error in those financial statements." (ASC, Topic 250, Sub-topic 10, § 20.)

32. Upon the discovery of an error in a previously issued financial statement, the "error . . . shall be reported as an error correction[] by restating the prior-period financial statements. Restatement requires all of the following: [a] The cumulative effect on periods prior to those presented shall be reflected in the carrying

amounts of assets and liabilities as of the beginning of the first period presented[;] [b] An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period[;] [and] [c] Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error." (ASC, Topic 250, Sub-topic 10, § 45, ¶ 23.) Other circumstances requiring the revision of financial statements, neither of which are applicable here, include a change in the reporting entity or a change in an accounting principle. (ASC, Topic 250, Sub-topic 10, § 45.)

33. Upon restating financial statements for the purpose of correcting an error, "the entity shall disclose that its previously issued financial statements have been restated, along with a description of the nature of the error. The entity also shall disclose both of the following: [a] The effect of the correction on each financial statement line item and any per-share amounts affected for each prior period presented [and] [b] The cumulative effect of the change on retained earnings or other appropriate components of equity or net assets in the statement of financial position . . . ." (ASC, Topic 250, Sub-topic 10, § 50, ¶ 7.)

34. Restating financial statements dilute public confidence in the companies to which they belong. Further, restatements confuse those who use them. Consequently, financial statements prepared in accordance with GAAP should be

considered final, and only restated for the purpose of correcting material errors. (ASC, Topic 105, Sub-topic 10, § 5, ¶ 6.)

**C. Checkpoint Identifies a Material Weakness in its Internal Controls and Restates the Company's Financials**

35. On November 3, 2015, after the close of the market, Checkpoint announced that it had "discovered financial statement errors attributable to the accounting for its quarterly income tax provision" during its preparation of the third quarter financial statements. Checkpoint also announced that, as a result, the Company would be restating its financials for the quarterly periods ended March 29, 2015 and June 28, 2015 and the six month period ended June 28, 2015.

36. Checkpoint filed its amended quarterly financial statements the following day on November 4, 2015. The restated financials revealed increases in tax expenses and decreases in earnings-per-share amounts. For the quarter ended March 29, 2015, Checkpoint's tax expense increased $1.8 million, net loss increased $1.8 million, and diluted earnings per share decreased by $0.04; for the quarter ended June 28, 2015, Checkpoint's tax expense increased $4.1 million, net loss increased $4.1 million, and diluted earnings per share decreased by $0.10; and for the year-to-date ended June 28, 2015, Checkpoint's tax expense increased by $5.9 million, net loss increased by $5.9 million, and diluted earnings per share decreased by $0.14.

37. Checkpoint also filed an amended annual report (Form 10-K) for fiscal 2014. The amended annual report confirmed that the Company had not maintained

"effective controls over the period end financial reporting process for the quarterly periods ended March 29, 2015 and June 28, 2015 that resulted in a material misstatement of the 2015 interim financial statements." Checkpoint explained that the controls in question related to "accounting for our quarterly income tax calculation surrounding the inclusion or exclusion of entities with valuation allowances."

38. Prior to November 3 and 4, 2015, Checkpoint had represented to investors that it "evaluate[d] [the Company's] deferred income taxes quarterly to determine if valuation allowances are required or should be adjusted." Checkpoint claimed that determined whether its valuation allowances should be established and/or adjusted pursuant to ASC 740.

39. ASC 740 requires companies to assess whether valuation allowances should be established against their deferred tax assets based on all available evidence, both positive and negative, using a "more likely than not" standard. In the assessment for a valuation allowance, appropriate consideration is given to all positive and negative evidence related to the realization of the deferred tax assets. According to the Company's public filings, Checkpoint's application of ASC 740 considered "the nature, frequency and severity of current and cumulative losses, forecasts of future profitability, the duration of statutory carryforward periods, [the Company's] experience with loss carryforwards not expiring and tax planning

alternatives." Checkpoint emphasized its "commit[ment] to implementing tax planning actions, when deemed appropriate, in jurisdictions that experience losses in order to realize deferred tax assets prior to their expiration." As of December 28, 2014 and December 29, 2013, Checkpoint recorded net deferred tax assets of $12.8 million and $31.5 million, respectively.

40. Notwithstanding the close attention Checkpoint paid to its valuation allowances, Defendants materially misstated these figures to investors. Further, Checkpoint's material weakness over internal controls ultimately led Defendants to advise investors not to rely upon certain financial metrics affected by the Company's tax expenses, such as earnings-per-share.

41. Prior to November 4, 2015, Defendants had never told investors to disregard the Company's earnings-per-share figures. To the contrary, Defendants frequently and repeatedly conveyed the Company's financial and operational strength by providing investors with earnings-per-share figures.

42. Defendants consistently cited Checkpoint's earnings-per-share as proof of growth and success. Defendants even used Checkpoint's earnings-per-share as a means of providing guidance to investors and analysts. For example, in just the three quarters prior to the class period, Defendants point investors to the Company's earnings per share when discussing the Company's quarterly success. On the Company's August 4, 2014 earnings call for Q2 2014 results, Defendants state that

they are "pleased to report that Checkpoint's strongest first half operating income margin since before 2008 and highest earnings performance since 2010" and "[n]on-GAAP earnings per share were $0.25 versus $0.11 in the second quarter of 2013." (Q2 2014 Earnings Call.) Again on the November 3, 2014 Q3 earnings call, Defendants indicate that "net revenues were down to 8.2% in the quarter," while touting that they "absorbed incremental investments on our growth initiatives and a number of difficult year-over-year comparisons on the SG&A line to report non-GAAP earnings per share of $0.22 flat to last year." (Q3 2014 Earnings Call.) Finally, on the March 5, 2015 Q4 2014 earnings call, Defendants acknowledge that "net revenues declined by 4%," but again refer investors to earnings per share stating, "[n]on-GAAP diluted earnings per share increased by 83% to $0.76." (Q2 2014 Earnings Call.)

43. Defendants continued their practice of relying on earnings-per-share even during the Class Period, notwithstanding the fact that they were failing to properly account for the Company's tax liability. For example, on May 10, 2015, during the Company's earnings conference call for the quarter ended March 29, 2015, Defendant Babich stated, in pertinent part, as follows:

> Despite lower revenue driven by unprecedented strengthening of the U.S. dollar and the sunset of our large 2014 EAS hardware projects, we were able to keep our non-GAAP adjusted diluted earnings per share flat, at $0.04. We're working hard on the execution of our long-term strategic growth initiatives and working equally hard to secure our next significant equipment rollout.

and Defendant Lucania stated:

> And now on to guidance. Our guidance for FY ‘15 remains unchanged. We continue to expect net revenue in the range of $575 million to $625 million, adjusted EBITDA in the range of $55 million to $68 million, non-GAAP diluted earnings per share in the range of $0.40 to $0.50.

44. Defendants never told investors that Checkpoint’s earnings-per-share should not be relied upon, despite the fact that they knew that the figure was subject to a volatile and unpredictable valuation allowance calculation. But for the Company being forced to announce its material weakness over internal controls, investors would never have discovered that one of the Company’s chief financial metrics (*i.e.*, earnings-per-share) should not be relied upon.

**D. Defendants’ Materially False and Misleading Statements**

45. Checkpoint’s public statements, press releases, and filings with the SEC contained false and misleading statements of material fact and omitted to state other material facts required to be stated in order to make statements therein not misleading. The omissions and misrepresentations within these statements related to: (i) Checkpoint’s accounting practices and procedures concerning its quarterly income tax provision; (ii) the adequacy and efficacy of Checkpoint’s internal controls over financial reporting; and (iii) Defendants’ reliance on earnings-per-share as a means to report and predict Checkpoint’s financial and operational strength. As alleged below, Defendants made these statements while knowing they

were false and/or materially misleading or made them with deliberate recklessness as to whether they would materially mislead investors.

*March 5, 2015 – Yearly Report*

46. On March 5, 2015, Checkpoint filed a yearly report on Form 10-K with the SEC announcing the Company's financial and operating results for the year ended December 28, 2014 (the "2014 Form 10-K"). Defendants Babich and Richard signed the 2014 Form 10-K on behalf of the Company.

47. Checkpoint's 2014 Form 10-K assured investors of the effectiveness of the Company's controls over financial reporting in the section titled "Item 9A. Controls and Procedures." Specifically, the 2014 Form 10-K stated:

> **Evaluation of Disclosure Controls and Procedures**
>
> Management, with the participation of the Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended) as of December 28, 2014. Based on that evaluation, **our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of December 28, 2014.**
>
> **Management's Annual Report on Internal Control Over Financial Reporting**
>
> Management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Our internal control over financial reporting is designed to provide reasonable assurance as to the reliability of our financial reporting and the preparation of the consolidated financial statements for external purposes in accordance with generally accepted accounting principles. Because of its inherent

> limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.
>
> Management performed an assessment of the effectiveness of our internal control over financial reporting as of December 28, 2014 using criteria established in the *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on that assessment, **management has concluded that our internal control over financial reporting was effective as of December 28, 2014.**
>
> The effectiveness of our internal control over financial reporting as of December 28, 2014 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears under Item 8.

(2014 Form 10-K, p. 96.)

48. The statements in Paragraph 47 above (indicated in bold-faced font) are false and/or materially misleading because they omitted that the Company was not accounting properly for its quarterly income tax provision. These omissions and/or misrepresentations were material to Checkpoint investors because the true facts would have altered the total mix of information available to investors when deciding to purchase Checkpoint stock.

49. Checkpoint's 2014 Form 10-K also contained materially misleading warning language concerning the Company's "relatively complex tax structure." The 2014 Form 10-K stated as follows:

> **As a global business, we have a relatively complex tax structure, and there is a risk that tax authorities will disagree with our tax positions.**
>
> Since we conduct operations worldwide through our foreign subsidiaries, we are subject to complex transfer pricing regulations in the countries in which we operate. Transfer pricing regulations generally require that, for tax purposes, transactions between us and our foreign affiliates be priced on a basis that would be comparable to an arm's length transaction and that contemporaneous documentation be maintained to support the tax allocation. Although uniform transfer pricing standards are emerging in many of the countries in which we operate, there is still a relatively high degree of uncertainty and inherent subjectivity in complying with these rules. To the extent that any foreign tax authorities disagree with our transfer pricing policies, we could become subject to significant tax liabilities and penalties. Our tax returns are subject to review by taxing authorities in the jurisdictions in which we operate. Although we believe that we have provided for all tax exposures, the ultimate outcome of a tax review could differ materially from our provisions.
>
> We record a valuation allowance to reduce our deferred tax assets to the amount that it is more likely than not to be realized. Our assessments about the realizability of our deferred tax assets are based on estimates of our future taxable income by tax jurisdiction, the prudence and feasibility of possible tax planning strategies, and the economic environments in which we do business. Any changes in these assessments could have a material impact on our results of operations.

(2014 Form 10-K, pp. 21-22.)

50. The statements in Paragraph 49 above are false and/or materially misleading because they fail to tell investors that the Company was not properly accounting for its tax expenses at the time of the 2014 Form 10-K. The warning language misleadingly warned of a risk to come when in fact that risk had already materialized. Furthermore, while the Company warned that "[a]ny changes in these

assessments could have a material impact on our results of operations," Defendants did not tell investors that certain critical performance metrics (such as earnings-per-share) should never be relied upon regardless of the accuracy of these assessments. These omissions and/or misrepresentations were material to Checkpoint investors because the true facts would have altered the total mix of information available to investors when deciding to purchase Checkpoint stock.

51. Further, in connection with Checkpoint's 2014 Form 10-K, Defendants Babich and Richard each certified pursuant to SOX that they reviewed the 2014 Form 10-K. Specifically, Babich and Richard each certified that:

> 1. I have reviewed this Form 10-K report of Checkpoint Systems, Inc.;
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the

registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

   b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.**

(2014 Form 10-K, Exs. 31.1 & 31.2.)

52. Given the falsity and/or misleading nature of the statements in Paragraphs 47 and 49 above, Babich's and Richard's certifications were consequently false and/or materially misleading. These omissions and/or misrepresentations were material to Checkpoint investors because the true facts would have altered the total mix of information available to investors when deciding to purchase Checkpoint stock.

*May 6, 2015 – Quarterly Report*

53. On May 6, 2015, Checkpoint filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 29, 2015 (the "Q1 2015 Form 10-Q"). Defendant Lucania signed the Q1 2015 Form 10-Q on behalf of the Company.

54. The Q1 2015 Form 10-Q Consolidated Balance Sheet reported (i) Total Assets of $679,437,000; (ii) Total Current Liabilities as $147,133,000; (iii) Total Stockholder's Equity as $295,807,000; and (iv) Total Liabilities and Stockholder's Equity as $679,437,000. (Q1 2015 Form 10-Q, p. 3.).

55. The Q1 2015 Form 10-Q Consolidated Statement of Operations reported (i) Income tax expense of $71,000; (ii) Net loss of ($745,000); and (iii) Net loss per common share of ($0.02). (Q1 2015 Form 10-Q, p. 4.)

56. The statements in Paragraphs 54 and 55 above were false and/or materially misleading because they omitted that the Company was not accounting properly for its quarterly income tax provision. As a result, the Company's true financial figures were as follows: Total Assets of $676,656,000; Total Current Liabilities of $146,788,000; Total Stockholder's Equity of $293,993,000; Total Liabilities and Stockholder's Equity of $676,656,000; Income tax expense of $1,885,000; Net loss of ($2,559,000); and Net loss per common share of ($0.06). (Amended Q1 2015 Form 10-Q, pp. 5-6.) These omissions were material to Checkpoint investors because the true facts would have altered the total mix of information available to investors when deciding to purchase Checkpoint stock.

57. Checkpoints' Q1 2015 Form 10-Q assured investors of the effectiveness of the Company's controls over financial reporting in the section titled "Item 4. Controls and Procedures." The Q1 2015 Form 10-Q stated:

> **Evaluation of Disclosure Controls and Procedures**
>
> Management, with the participation of the Chief Executive Officer and Acting Chief Financial Officer, conducted an evaluation (as required by Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the Exchange Act)) of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on that evaluation, **our Chief Executive Officer and Acting Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.**
>
> **Changes in Internal Control over Financial Reporting**

> There have been no changes in our internal control over financial reporting that occurred during our first fiscal quarter of 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Q1 2015 Form 10-Q, p. 35.)

58. The statements in Paragraphs 57 above (indicated in bold-faced font) are false and/or materially misleading because they omitted that the Company was not accounting properly for its quarterly income tax provision. These omissions and/or misrepresentations were material to Checkpoint investors because the true facts would have altered the total mix of information available to investors when deciding to purchase Checkpoint stock.

59. Checkpoint's Q1 2015 Form 10-Q did not provide any risk factors to investors other than what it had already provided in the 2014 Form 10-K. The Q1 2015 Form 10-Q stated that "There have been no material changes from December 28, 2014 to the significant risk factors and uncertainties known to us that, if they were to occur, could materially adversely affect our business, financial condition, operating results and/or cash flow. For a discussion of our risk factors, refer to Part I - Item 1A – 'Risk Factors', contained in our Annual Report on Form 10-K for the year ended December 28, 2014."

60. By incorporating the 2014 Form 10-K's materially misleading warning language, the Q1 2015 Form 10-Q was likewise materially misleading because it failed to tell investors that the Company was not properly accounting for its tax

expenses. The warning language misleadingly warned of a risk to come when in fact that risk had already materialized. Furthermore, while the Company warned that "[a]ny changes in these assessments could have a material impact on our results of operations," Defendants did not tell investors that certain critical performance metrics (such as earnings-per-share) should never be relied upon regardless of the accuracy of these assessments. These omissions and/or misrepresentations were material to Checkpoint investors because the true facts would have altered the total mix of information available to investors when deciding to purchase Checkpoint stock.

61. Further, in connection with Checkpoint's Q1 2015 Form 10-Q, Defendants Babich and Lucania each certified pursuant to SOX that they reviewed the Q1 2015 Form 10-Q. Specifically, Babich and Lucania each certified that:

> 1. I have reviewed this Form 10-Q of Checkpoint Systems, Inc.;
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal

control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's**

**ability to record, process, summarize and report financial information; and**

b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.**

(Q1 2015 Form 10-Q, Exs. 31.1 & 31.2.)

62. Given the falsity and/or misleading nature of the statements in Paragraphs 54, 55, 57 and 59 above, Babich's and Lucania's certifications were consequently false and/or materially misleading. These omissions and/or misrepresentations were material to Checkpoint investors because the true facts would have altered the total mix of information available to investors when deciding to purchase Checkpoint stock.

*May 6, 2015 – Press Release*

63. Checkpoint issued a press release disclosing its first quarter earnings results for fiscal year 2015 on May 6, 2015 (the "Q1 2015 Press Release"). Checkpoint filed a copy of the Q1 2015 Press Release as an exhibit to a Form 8-K with the SEC on May 6, 2015.

64. For the first quarter of fiscal year 2015, the Q1 2015 Press Release reported (i) Total Assets of $679,437,000; (ii) Total Current Liabilities as $147,133,000; (iii) Total Stockholder's Equity as $295,807,000; and (iv) Total Liabilities and Stockholder's Equity as $679,437,000. (Q1 2015 Press Release.)

65. The Q1 2015 Press Release also reported (i) Income tax expense of $71,000; (ii) Net loss of ($745,000); and (iii) Net loss per common share of ($0.02). (Q1 2015 Press Release.)

66. The statements in Paragraphs 64 and 65 above were false and/or materially misleading because they omitted that the Company was not accounting properly for its quarterly income tax provision. As a result, the Company's true financial figures were as follows: Total Assets of $676,656,000; Total Current Liabilities of $146,788,000; Total Stockholder's Equity of $293,993,000; Total Liabilities and Stockholder's Equity of $676,656,000; Income tax expense of $1,885,000; Net loss of ($2,559,000); and Net loss per common share of ($0.06). (Amended Q1 2015 Form 10-Q, pp. 5-6.) These omissions were material to Checkpoint investors because the true facts would have altered the total mix of information available to investors when deciding to purchase Checkpoint stock.

*May 10, 2015 – Earnings Conference Call*

67. On May 10, 2015, Defendants Babich and Lucania held an earnings conference call on behalf of the Company (the "Q1 2015 Earnings Call").

68. Defendant Babich, in his opening remarks, touted the Company's strong earnings-per-share. Babich stated, in pertinent part, as follows: "Despite lower revenue driven by unprecedented strengthening of the U.S. dollar and the sunset of our large 2014 EAS hardware projects, we were able to keep our non-

GAAP adjusted diluted earnings per share flat, at $0.04. We're working hard on the execution of our long-term strategic growth initiatives and working equally hard to secure our next significant equipment rollout." (Earnings Call Transcript, May 10, 2015.)

69. Similarly, Defendant Lucania discussed the Company's financial results for the quarter, including its earnings per share. Lucania stated, in pertinent part:

> **Non-GAAP diluted earnings per share was $0.04, flat to last year**. Cash used by our operations was $400,000 compared with cash flow provided by operations of $8.6 million in the same period last year. Capital expenditures increased in the first quarter from $3.3 million in 2014 to $5.8 million this year, reflecting increased investment spending for our strategic initiatives.
>
> And now on to guidance. Our guidance for FY '15 remains unchanged. We continue to expect net revenue in the range of $575 million to $625 million, adjusted EBITDA in the range of $55 million to $68 million, **non-GAAP diluted earnings per share in the range of $0.40 to $0.50.**

(Earnings Call Transcript, May 10, 2015.)

70. The statements in Paragraph 68 and 69 above were false and/or materially misleading because the Company's true earnings-per-share for the first quarter of fiscal 2015 was in fact ($0.06). Furthermore, given that earnings-per-share is not a reliable indicator of the Company's operational and financial strength, Defendants' guidance in the form of earnings-per-share estimates was materially misleading. These omissions were material to Checkpoint investors because the true

facts would have altered the total mix of information available to investors when deciding to purchase Checkpoint stock.

*August 4, 2015 – Quarterly Report*

71. On August 4, 2015, Checkpoint filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 28, 2015 (the "Q2 2015 Form 10-Q"). Defendants Lucania signed the Q2 2015 Form 10-Q on behalf of the Company.

72. The Q2 2015 Form 10-Q Consolidated Balance Sheet reported (i) Total Assets of $663,174,000; (ii) Total Current Liabilities as $129,462,000; (iii) Total Stockholder's Equity as $294,066,000; and (iv) Total Liabilities and Stockholder's Equity as $663,174,000. (Q2 2015 Form 10-Q, p. 3.).

73. The Q2 2015 Form 10-Q Consolidated Statement of Operations reported (i) Income tax benefit of ($698,000); (ii) Net loss of ($5,407,000); and (iii) Net loss per common share of ($0.13). (Q1 2015 Form 10-Q, p. 4.)

74. The statements in Paragraphs 72 and 73 above were false and/or materially misleading because they omitted that the Company was not accounting properly for its quarterly income tax provision. As a result, the Company's true financial figures were as follows: Total Assets of $656,308,000; Total Current Liabilities of $129,117,000; Total Stockholder's Equity of $288,167,000; Total Liabilities and Stockholder's Equity of $656,308,000; Income tax expense of

$3,387,000; Net loss of ($9,492,000); and Net loss per common share of ($0.22). (Amended Q2 2015 Form 10-Q, pp. 5-6.) These omissions were material to Checkpoint investors because the true facts would have altered the total mix of information available to investors when deciding to purchase Checkpoint stock.

75. Checkpoints' Q2 2015 Form 10-Q assured investors of the effectiveness of the Company's controls over financial reporting in the section titled "Item 4. Controls and Procedures." The Q1 2015 Form 10-Q stated:

> **Evaluation of Disclosure Controls and Procedures**
>
> Management, with the participation of the Chief Executive Officer and Acting Chief Financial Officer, conducted an evaluation (as required by Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the Exchange Act)) of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on that evaluation, **our Chief Executive Officer and Acting Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.**
>
> **Changes in Internal Control over Financial Reporting**
>
> There have been no changes in our internal control over financial reporting that occurred during our first fiscal quarter of 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Q2 2015 Form 10-Q, p. 40.)

76. The statements in Paragraph 75 above (indicated in bold-faced font) are false and/or materially misleading because they omitted that the Company was not accounting properly for its quarterly income tax provision. These omissions and/or

misrepresentations were material to Checkpoint investors because the true facts would have altered the total mix of information available to investors when deciding to purchase Checkpoint stock.

77. Checkpoint's Q2 2015 Form 10-Q did not provide any risk factors to investors other than what it had already provided in the 2014 Form 10-K. The Q2 2015 Form 10-Q stated that "There have been no material changes from December 28, 2014 to the significant risk factors and uncertainties known to us that, if they were to occur, could materially adversely affect our business, financial condition, operating results and/or cash flow. For a discussion of our risk factors, refer to Part I - Item 1A – 'Risk Factors', contained in our Annual Report on Form 10-K for the year ended December 28, 2014."

78. By incorporating the 2014 Form 10-K's materially misleading warning language, the Q2 2015 Form 10-Q was likewise materially misleading because it failed to tell investors that the Company was not properly accounting for its tax expenses. The warning language misleadingly warned of a risk to come when in fact that risk had already materialized. Furthermore, while the Company warned that "[a]ny changes in these assessments could have a material impact on our results of operations," Defendants did not tell investors that certain critical performance metrics (such as earnings-per-share) should never be relied upon regardless of the accuracy of these assessments. These omissions and/or misrepresentations were

material to Checkpoint investors because the true facts would have altered the total mix of information available to investors when deciding to purchase Checkpoint stock.

79. Further, in connection with Checkpoint's Q2 2015 Form 10-Q, Defendants Babich and Lucania each certified pursuant to SOX that they reviewed the Q1 2015 Form 10-Q. Specifically, Babich and Lucania each certified that:

> 1. I have reviewed this Form 10-Q of Checkpoint Systems, Inc.;
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
>    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
>    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under

our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.**

(Q2 2015 Form 10-Q, Exs. 31.1 & 31.2.)

80. Given the falsity and/or misleading nature of the statements in Paragraphs 72, 73, 75 and 77 above, Babich's and Lucania's certifications were

consequently false and/or materially misleading. These omissions and/or misrepresentations were material to Checkpoint investors because the true facts would have altered the total mix of information available to investors when deciding to purchase Checkpoint stock.

*August 3, 2015 – Press Release*

81. Checkpoint issued a press release disclosing its second quarter earnings results for fiscal year 2015 on August 3, 2015 (the "Q2 2015 Press Release"). Checkpoint filed a copy of the Q2 2015 Press Release as an exhibit to a Form 8-K with the SEC on August 3, 2015.

82. For the second quarter of fiscal year 2015, the Q2 2015 Press Release reported (i) Total Assets of $663,174,000; (ii) Total Current Liabilities as $129,462,000; (iii) Total Stockholder's Equity as $294,066,000; and (iv) Total Liabilities and Stockholder's Equity as $663,174,000. (Q2 2015 Press Release.)

83. The Q2 2015 Press Release also reported (i) Income tax benefit of ($698,000); (ii) Net loss of ($5,407,000); and (iii) Net loss per common share of ($0.13). (Q2 2015 Press Release.)

84. The statements in Paragraphs 82 and 83 above were false and/or materially misleading because they omitted that the Company was not accounting properly for its quarterly income tax provision. As a result, the Company's true financial figures were as follows: Total Assets of $656,308,000; Total Current

Liabilities of $129,117,000; Total Stockholder's Equity of $288,167,000; Total Liabilities and Stockholder's Equity of $656,308,000; Income tax expense of $3,387,000; Net loss of ($9,492,000); and Net loss per common share of ($0.22). (Amended Q2 2015 Form 10-Q, pp. 5-6.) These omissions were material to Checkpoint investors because the true facts would have altered the total mix of information available to investors when deciding to purchase Checkpoint stock.

*August 4, 2015 - Earnings Conference Call*

85. On August 4, 2015, Defendants Babich and Lucania held an earnings conference call on behalf of the Company to discuss the earnings reports that the Company had released that day for the second quarter of fiscal year 2015 (the "Q2 2015 Earnings Call").

86. During the Q2 2015 Earnings Call, Defendant Lucania discussed the Company's financial results for the quarter, including its earnings per share. Specifically, Lucania stated, in pertinent part:

> On to SG&A; expenses for the second quarter decreased by 3.5 million, from 55.4 million in 2014, to 51.9 million in 2015. Foreign currency translation effects reduced SG&A by 4.8 million. The 1.3 million constant currency increase was related to investments in our strategic initiatives, and some one-time costs partially offset by savings related to our profit improvement plan. **Non-GAAP diluted earnings per share was $0.10, down from $0.25 last year**.
>
> . . .
>
> Now on to guidance; our guidance for fiscal year 2015 remains unchanged. We continue to expect net revenues in the range of 575

> million to 625 million. Adjusted EBITDA in the range of 55 million to 68 million, and **non-GAAP diluted net earnings per share in the range of $0.40 to $0.50**. As a reminder, our guidance assumes a continuation of the current foreign currency exchange rate environment. As we discussed in the last call, over two-thirds of our sales are denominated in foreign currencies. We still estimate that our 2015 revenue guidance would be approximately $50 million higher at constant 2014 foreign exchange rates, while the impact on adjusted EBITDA is approximately $7 million.

(Earnings Call Transcript, August 4, 2015.)

87. The statements in Paragraph 86 above were false and/or materially misleading because the Company's true earnings-per-share for the second quarter of fiscal 2015 was in fact ($0.22). Furthermore, given that earnings-per-share is not a reliable indicator of the Company's operational and financial strength, Defendants' guidance in the form of earnings-per-share estimates was materially misleading. These omissions were material to Checkpoint investors because the true facts would have altered the total mix of information available to investors when deciding to purchase Checkpoint stock.

## E. Checkpoint Reveals the Truth and Investors Sustain Significant Damages

*November 3, 2015 – Notice of Non-Reliance*

88. On November 3, 2015, post-market, Checkpoint filed a current report (Form 8-K) with the SEC announcing "Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review." The Company stated, in pertinent part:

During the preparation of the third quarter financial statements, the Company discovered financial statement errors attributable to the accounting for its quarterly income tax provision. As a result of these errors, on November 2, 2015, the Audit Committee of the Board of Directors (the "Audit Committee") of Checkpoint Systems, Inc. (the "Company") concluded that **the unaudited financial statements for the quarterly period ended March 29, 2015, the quarterly period ended June 28, 2015 and the year-to-date period ended June 28, 2015 contained in the Company's Quarterly Reports on Form 10-Q for the quarterly period ended March 29, 2015 and the quarterly period ended June 28, 2015 should no longer be relied upon due to the effect of financial statement errors that are attributable to an error in the accounting for the Company's quarterly income tax provision**. Accordingly, investors should no longer rely upon the Company's previously-issued financial statements for these periods and any earnings releases or other Company communications relating to these periods. The Company intends to restate its previously-issued financial statements for the quarterly periods ended March 29, 2015 and June 28, 2015 and the six month period ended June 28, 2015 through the filing of amended Quarterly Reports on Form 10-Q/A for the quarterly periods ended March 29, 2015 and June 28, 2015. These amended Quarterly Reports on Form 10-Q/A will be filed with the Securities and Exchange Commission ("SEC") as soon as possible.

Based on our assessment to date, we expect the key impacts on our previously reported results for the first and second quarters of fiscal 2015 to be as follows:

- Quarter ended March 29, 2015: increase in tax expense of $1.8 million, increase in net loss of $1.8 million, and decrease in diluted earnings per share of $0.04;

- Quarter ended June 28, 2015: increase in tax expense of $4.1 million, increase in net loss of $4.1 million, and decrease in diluted earnings per share of $0.10; and

- Year-to-date ended June 28, 2015: increase in tax expense of $5.9 million, increase in net loss of $5.9 million, and decrease in diluted earnings per share of $0.14.

(November 3, 2015 Form 8-K.)

89. The following day, Checkpoint filed an amended 2014 Form 10-K ("Amended 2014 Form 10-K"), Q1 2015 Form 10-Q ("Amended Q1 2015 Form 10-Q"), and Q2 2015 Form 10-Q ("Amended Q2 2015 Form 10-Q"). Defendant Babich signed the Amended 2014 Form 10-K on behalf of the Company. Defendant Lucania signed the Amended Q1 2015 Form 10-Q, and the Amended Q2 2015 Form 10-Q on behalf of the Company.

*November 4, 2015 – Amended 2014 Form 10-K*

90. The Amended 2014 Form 10-K further revealed the details surrounding the Company's "material weakness" within its internal controls over financial reporting. Within the 2014 Form 10-K's "Notes to Consolidated Financial Statements," in a section titled "Item 9A. Controls and Procedures," Checkpoint stated in pertinent part:

> **Evaluation of Disclosure Controls and Procedures**
>
> Management, with the participation of the Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. At the time that our Annual Report on Form 10-K for the year ended December 28, 2014 was filed on March 5, 2015, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of December 28, 2014. Subsequent to that evaluation, **our Chief Executive Officer and Acting Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of December 28, 2014 because of the subsequently-discovered**

**material weakness in our internal control over financial reporting described below**. Accordingly, management is restating its conclusions in this Amendment No. 1 to our Annual Report on Form 10-K for the year ended December 28, 2014.

**Management's Annual Report on Internal Control Over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Our internal control over financial reporting is designed to provide reasonable assurance as to the reliability of our financial reporting and the preparation of the consolidated financial statements for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management performed an assessment of the effectiveness of our internal control over financial reporting as of December 28, 2014 using criteria established in the Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Management re-evaluated the effectiveness of the design and operation of our internal control over financial reporting and disclosure controls and procedures and concluded that **we did not maintain effective controls over the period end financial reporting process for the quarterly periods ended March 29, 2015 and June 28, 2015 that resulted in a material misstatement of the 2015 interim financial statements. Specifically, effective controls were not maintained over the accounting for our quarterly income tax calculation surrounding the inclusion or exclusion of entities with valuation allowances. Additionally, we incorrectly calculated the valuation allowance related to a non U.S. entity with a deferred tax liability related to an indefinite lived intangible. Because of this material weakness, management, including the Chief Executive Officer and Acting Chief Financial Officer, concluded that our disclosure controls and procedures**

> **were not effective as of March 29, 2015 and June 28, 2015.** The control deficiency constituted a material weakness, but did not result in a material misstatement in our audited consolidated financial statements for the year ended December 28, 2014, or any of the interim unaudited consolidated financial statements for the quarters included therein. However, the control deficiency could have resulted in a material misstatement to the annual or interim consolidated financial statements that would not have been prevented or detected. Accordingly, our management has determined that this deficiency constitutes a material weakness. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

(Amended 2014 Form 10-K, p. 99.)

*<u>November 4, 2015 – Amended Q1 2015 Form 10-Q</u>*

91. The Amended Q1 2015 Form 10-Q Consolidated Balance Sheet restated (i) Total Assets of $676,656,000; (ii) Total Current Liabilities as $146,788,000; (iii) Total Stockholder's Equity as $293,993,000; and (iv) Total Liabilities and Stockholder's Equity as $676,656,000. (Amended Q1 2015 Form 10-Q, p. 5.)

92. The Amended Q1 2015 Form 10-Q Consolidated Statement of Operations restated (i) Income tax expense of $1,885,000; (ii) Net loss of ($2,559,000); and (iii) Net loss per common share of ($0.06). (Amended Q1 2015 Form 10-Q, p. 6.)

93. Checkpoint's Amended Q1 2015 Form 10-Q confirmed that the Company had not maintained effective internal controls over financial reporting in the section titled "Item 4. Controls and Procedures." The Q1 2015 Form 10-Q stated:

> **Evaluation of Disclosure Controls and Procedures**
>
> In connection with the filing of our Original Form 10-Q on May 6, 2015, our Chief Executive Officer and Acting Chief Financial Officer evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 (Exchange Act) Rule 13a-15(e)) as of March 29, 2015, the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Acting Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of such period to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to management, as appropriate, to allow timely decisions regarding required disclosure.
>
> Subsequent to that evaluation, in connection with the restatement discussed in Note 1 - "Restatement of Previously Reported Consolidated Financial Statements" to our unaudited consolidated financial statements, management, including our Chief Executive Officer and Acting Chief Financial Officer, re-evaluated the effectiveness of the design and operation of our internal control over financial reporting and disclosure controls and procedures as of March 29, 2015 and **our Chief Executive Officer and Acting Chief Financial Officer concluded that, due to the material weakness identified in our internal control over financial reporting discussed below, our disclosure controls and procedures were not effective as of March 29, 2015**. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.

> **Material Weakness**
>
> As a result of the determination to restate these previously-issued financial statements, management re-evaluated the effectiveness of the design and operation of our internal control over financial reporting and disclosure controls and procedures and has **concluded that we did not maintain effective controls over the period end financial reporting process for the quarterly periods ended March 29, 2015 and June 28, 2015**. **Specifically, effective controls were not maintained over the accounting for our quarterly income tax calculation surrounding the inclusion or exclusion of entities with valuation allowances. Additionally, we incorrectly calculated the valuation allowance related to a non U.S. entity with a deferred tax liability related to an indefinite lived intangible. This control deficiency resulted in the restatement of our unaudited consolidated financial statements for the quarters ended March 29, 2015 and June 28, 2015 and the year-to-date period ended June 28, 2015. Accordingly, we concluded that this control deficiency constitutes a material weakness.**
>
> The control deficiency constituted a material weakness, but did not result in a material misstatement to our audited consolidated financial statements for the year ended December 28, 2014, or any of the interim unaudited consolidated financial statements for the quarters included therein. However, the control deficiency could have resulted in a material misstatement to the annual or interim consolidated financial statements that would not have been prevented or detected. Our Annual Report on Form 10-K for the year ended December 28, 2014 will be amended to reflect the conclusion by management that our internal control over financial reporting and disclosure controls and procedures were not effective as of December 28, 2014.

(Amended Q1 2015 Form 10-Q, p. 40.)

*November 4, 2015 – Amended Q2 2015 Form 10-Q*

94. The Amended Q2 2015 Form 10-Q Consolidated Balance Sheet restated (i) Total Assets of $656,308,000; (ii) Total Current Liabilities as

$129,117,000; (iii) Total Stockholder's Equity as $288,167,000; and (iv) Total Liabilities and Stockholder's Equity as $656,308,000. (Amended Q2 2015 Form 10-Q, p. 5.)

95. The Amended Q2 2015 Form 10-Q Consolidated Statement of Operations restated (i) Income tax expense of $3,387,000; (ii) Net loss of ($9,492,000); and (iii) Net loss per common share of ($0.22). (Amended Q2 2015 Form 10-Q, p. 6.)

96. Checkpoint's Amended Q2 2015 Form 10-Q confirmed that the Company had not maintained effective internal controls over financial reporting in the section titled "Item 4. Controls and Procedures." The Amended Q1 2015 Form 10-Q stated in pertinent part:

> **Evaluation of Disclosure Controls and Procedures**
>
> In connection with the filing of our Original Form 10-Q on August 4, 2015, our Chief Executive Officer and Acting Chief Financial Officer evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 (Exchange Act) Rule 13a-15(e)) as of June 28, 2015, the end of the period covered by this report. Based on that evaluation, our Chief Executive Officer and Acting Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of such period to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to management, as appropriate, to allow timely decisions regarding required disclosure.

Subsequent to that evaluation, in connection with the restatement discussed in Note 1 - "Restatement of Previously Reported Consolidated Financial Statements" to our unaudited consolidated financial statements, management, including our Chief Executive Officer and Acting Chief Financial Officer, re-evaluated the effectiveness of the design and operation of our internal control over financial reporting and disclosure controls and procedures as of June 28, 2015 and **our Chief Executive Officer and Acting Chief Financial Officer concluded that, due to the material weakness identified in our internal control over financial reporting discussed below, our disclosure controls and procedures were not effective as of June 28, 2015**. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.

**Material Weakness**

As a result of the determination to restate these previously-issued financial statements, management re-evaluated the effectiveness of the design and operation of our internal control over financial reporting and disclosure controls and procedures and has concluded that **we did not maintain effective controls over the period end financial reporting process for the quarterly periods ended March 29, 2015 and June 28, 2015. Specifically, effective controls were not maintained over the accounting for our quarterly income tax calculation surrounding the inclusion or exclusion of entities with valuation allowances. Additionally, we incorrectly calculated the valuation allowance related to a non U.S. entity with a deferred tax liability related to an indefinite lived intangible. This control deficiency resulted in the restatement of our unaudited consolidated financial statements for the quarters ended March 29, 2015 and June 28, 2015 and the year-to-date period ended June 28, 2015. Accordingly, we concluded that this control deficiency constitutes a material weakness.**

The control deficiency constituted a material weakness, but did not result in a material misstatement to our audited consolidated financial statements for the year ended December 28, 2014, or any of the interim unaudited consolidated financial statements for the quarters included

> therein. However, the control deficiency could have resulted in a material misstatement to the annual or interim consolidated financial statements that would not have been prevented or detected. Our Annual Report on Form 10-K for the year ended December 28, 2014 will be amended to reflect the conclusion by management that our internal control over financial reporting and disclosure controls and procedures were not effective as of December 28, 2014.

(Amended Q2 2015 Form 10-Q, p. 45.)

*November 4, 2015 – Earnings Conference Call*

97. On November 4, 2015, Defendants Babich and Lucania held an earnings conference call on behalf of the Company to discuss the Company's third quarter 2015 earnings reports, released that same day (the "Q3 2015 Earnings Call").

98. During the Q3 2015 Earnings Call, Defendants Babich and Lucania elaborated on the Company's inadequate controls over financial reporting. Specifically, Defendant Babich and Lucania stated the following, in pertinent part:

> **James Lucania**
>
> Now about EPS. **We no longer believe that earnings per share is a valuable metric with which analysts can evaluate our current or future business performance.** As you know, our GAAP effective tax rate is extremely sensitive to the geographic location of marginal profit dollars, given the valuation allowances on our deferred tax assets in the US and certain other jurisdiction. The GAAP effective tax rate bears no resemblance to our true cash tax obligations. Given the current base of pretax income, out tax expense is now unreasonably sensitive to modest increases or decreases in profitability, as well as the geographic distribution of that profitability. Given these circumstances, we've suspended our EPS guidance. However, we will continue our practice each quarter of providing you with our best estimates of cash income tax expense related to the fiscal year. For fiscal 2015, we continue to expect cash tax expense of approximately $5 million to $6 million.

99. This was the first time that Defendants told investors that they should not rely on earnings-per-share as a means of evaluating the Company. Contrary to this revelation, Defendants had repeatedly emphasized the Company's earnings-per-share as an important growth metric. Further, Defendants consistently provided investors with earnings-per-share estimates as a means for providing guidance and performance expectations. Investors relied heavily upon the Company's earnings-per-share calculations. The Company's earnings-per-share calculations were material to the market.

**F. Defendants Acted with Scienter**

*Knowledge of Falsity*

100. Defendants provided investors with material information concerning the Company's earnings-per-share while at the same time knowing that the Company's earnings-per-share was an unreliable metric and should not be relied upon to value the Company. The contradiction between Defendants' statements is strong evidence that Defendants either intended to mislead investors or recklessly disregarded the risk of doing so.

101. Defendants' internal control deficiency related to the Company's ability to properly account for its quarterly tax expense. The Company's tax expense directly affected its earnings-per-share. This is why Defendant Lucania told investors on November 4, 2015 that "[Defendants] no longer believe that earnings

per share is a valuable metric with which analysts can evaluate our current or future business performance."

102. Defendants' scienter in this regard is evidenced by the fact that they admittedly paid close attention to the Company's tax accounting during the Class Period. During the Company's earnings conference call on May 10, 2015, Defendant Lucania provided investors with guidance concerning the Company's effective tax rate as well as how a change in the tax rate would impact Checkpoint's earnings per share.

103. During in the Company's earnings conference call of August 4, 2015, Defendant Lucania again spoke about the Company's tax rate, stating that "varies wildly with [Checkpoint's] geographic revenue mix."

104. On November 4, 2015, Defendant Babich stated that:

> **George Babich**
>
> I would just add from a very high level that, as you know, the way the valuation allowance works, we need to demonstrate that we are turning profits in those particular jurisdictions. **And so, we could be there from an operational standpoint, but having that episodic event occur, like the settlement of the AIG legal matter back in the second quarter, which is all of a sudden this huge expense that hits the jurisdiction and then prevents you from demonstrating the profitability necessary to release the valuation allowance**.
>
> So it's not only operational issue which we are doing. We're hyper focused on profitability by jurisdiction with the tools that Jim has put in place on the profitability P&Ls by market, with the finance staff focused on it. We are hyper focused on being profitable in each jurisdiction, **but sometimes it's an episodic event that causes a huge**

> **expense and turns it into a loss that we can't release. So it's really very, very difficult to tell you when it's going to happen. When we are going to be out of valuation allowances.**
>
> . . .
>
> **George Babich**
>
> Even when you're out of the val allowances, you still have the issues that Jim referred to, which is, where do you make your income? So a good example is that Japan was a market that had almost no shrinkage up until two years ago. Now all of a sudden Japan's shrinkage has grown dramatically and the retailers -- we are working very closely with the retailers in japan and have extremely good business relationships and building our business there. Now more revenue coming out of japan has a completely different impact on kind of the mix of business, profitability by jurisdiction, where we have and what the tax rate will be.
>
> So it is -- **as it shifts from there back to the US, back over to Europe, the tax rate is just so volatile on a GAAP basis that it really does make more sense to use the cash tax rate**. So we'll be talking to you and our investors about possibly changing what we report. Not just EBITDA, but maybe using a cash tax rather than a GAAP tax rate. If that helps, then we certainly are open to doing that.

(emphasis added.)

105. Defendants' statement during and after the Class Period evidence the fact that they closely monitored the Company's tax accounting. Absent from Defendants' statements, however, was the fact that they were not accounting for Checkpoint's taxes properly. Furthermore, Defendants did not tell investors that their inability to properly account for valuation allowances and tax expenses rendered their contemporaneous earnings-per-share statements unreliable.

*Motive and Opportunity*

106. On March 17, 2016, Checkpoint filed a preliminary proxy statement with the SEC. The proxy statement details the Company's recent efforts to sell itself. As is evident from the proxy statement, Defendants engaged in the fraudulent conduct described herein in an effort to maximize the sale price of the Company as well as their own personal severance packages.

107. Checkpoint began exploring strategic alternatives in late-2014. On March 17, 2015, Checkpoint's Board of Directors discussed contacting targeted buyers for the purpose of selling the Company. On June 2, 2015, the Board authorized Morgan Stanley to reach out to a group of financial sponsors that would be interested in a potential strategic transaction with the Company. In August 2015, "Bidder A" expressed interest in acquiring the Company and proceeded to engage in due diligence. On October 25, 2015, "Bidder A" made a verbal offer to purchase Checkpoint for a price between $8.50 and $9.25 cash per share. At or around the same time, CCL Industries Inc. also initiated acquisition discussions with the Company.

108. On November 3 and 4, 2015, the Company announced the restatement, severely decreasing the stock price. Thereafter, "Bidder A" reduced its bid to between $7.50 and $8.00 cash per share. On December 1, 2015, CCL Industries Inc. submitted a bid of $10.00 cash per share, ultimately agreeing to raise its price to

$10.15 cash per share. On March 1, 2016, representatives of the Company finalized the merger agreement.

109. Defendant Babich was motivated to commit the fraud described herein in order to maximize his own personal benefit resulting from the sale of Checkpoint. In addition to Babich's severance payments, if the closing price of the Company's common stock averaged at least $12.00 per share for 30 trading days, Babich would receive an additional bonus equal to the amount of any cash bonus awarded to him for the year preceding the year of termination, or two times the amount of any cash bonus awarded to him for the year preceding the year of termination if such average closing price was at least $17.00 per share. (April 27, 2015 DEF 14A, p. 45.) Given the terms of Defendant Babich's compensation package, he had the opportunity of receiving a material increase in salary if the Company's common stock remained above $12.00 per share (and even more of an increase if the stock remained abouve $17.00 per share).

110. Defendants attempted to avoid the restatement and revelation about the Company's earnings-per-share for as long as possible. The fact that Bidder A lowered its offer following the Company's disclosures on November 3 and 4, 2015 is proof that the information was material and adverse. Defendants engaged in a reckless gamble by withholding this material adverse information for as long as possible in hopes that they would be able to reap the benefits before being exposed.

111. Separate and apart from the merger, Defendants had been under intense scrutiny from an activist shareholder, North Star Partners LP, since at least early 2015. In a series of letters, North Star Partners LP criticized Checkpoint's Board of Directors for "accounting restatements, earnings misses, guidance bombshells, ill-advised dividends, and significant management turnover." North Star Partners LP expressed a clear interest to engage in a proxy battle if Checkpoint did not accede to its demands.

112. The pressure being exerted upon Defendants by North Star Partners LP motivated them to engage in the fraudulent conduct described herein. If Defendants had revealed the truth about the Company's tax accounting and earnings-per-share in advance of the Company's 2015 Annual Meeting (held on June 3, 2015), Defendant Babich's job as well as the jobs of other Checkpoint insiders would have been placed in jeopardy. Rather than be terminated for cause or be voted off of the Company's Board of Directors, Defendants withheld the truth about the Company's finances.

## G. Loss Causation and Economic Loss

113. Checkpoint's stock price fell sharply in response to the Company's announcements on November 3, 2015 and November 4, 2015. Shares of Checkpoint fell $1.73, or 22% to close at $5.97 on November 4, 2015.

114. During the Class Period, as detailed herein, Checkpoint and the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Checkpoint's securities and operated as a fraud or deceit on Class Period purchasers of Checkpoint's securities by materially misleading the investing public. Later, when Checkpoint and defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Checkpoint's securities materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Checkpoint's securities during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

115. On November 3, 2015, Checkpoint's stock price closed at $7.70. On November 4, 2015, Checkpoint's stock price closed at $5.97 per share on unusually heavy volume. Between November 3, 2015 and November 4, 2015, Checkpoint's stock price fell $1.73 per share, a drop of approximately 22%. The significant decline in Checkpoint's stock price was caused directly by the Company's disclosure of its accounting problems and the revelation that earnings-per-share should no longer be relied when evaluating the Company's operational and financial strength.

## H. Presumption of Reliance; Fraud-On-The-Market

116. At all relevant times, the market for Checkpoint's common stock was an efficient market for the following reasons, among others:

(a) Checkpoint's common stock met the requirements for listing and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b) Checkpoint communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Checkpoint was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about Checkpoint was reflected in and incorporated into the Company's stock price during the Class Period.

117. As a result of the foregoing, the market for Checkpoint's common stock promptly digested current information regarding Checkpoint from all publicly

available sources and reflected such information in Checkpoint's stock price. Under these circumstances, all purchasers of Checkpoint's common stock during the Class Period suffered similar injury through their purchase of Checkpoint's common stock at artificially inflated prices, and a presumption of reliance applies.

118. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**I. No Safe Harbor: Inapplicability of Bespeaks Caution Doctrine**

119. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

120. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

121. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Checkpoint who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

122. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Checkpoint securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their

legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

123. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Checkpoint securities were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Checkpoint or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of February 26, 2016, there were 41,494,015 shares of Checkpoint common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

124. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

125. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class

and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

126. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Checkpoint;

(c) whether the Individual Defendants caused Checkpoint to issue false and misleading financial statements during the Class Period;

(d) whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Checkpoint's securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

127. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Against Defendants Checkpoint, Babich, Lucania, and Richard for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder

128. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

129. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

130. During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Checkpoint securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire Checkpoint's securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

131. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Checkpoint's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Checkpoint's finances and business prospects.

132. By virtue of their positions at Checkpoint, defendants had actual knowledge of the materially false and misleading statements and material omissions

alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

133. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of Checkpoint, the Individual Defendants had knowledge of the details of Checkpoint's internal affairs.

134. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Checkpoint. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Checkpoint's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the

market price of Checkpoint's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Checkpoint's business and financial condition which were concealed by defendants, Lead Plaintiff and the other members of the Class purchased or otherwise acquired Checkpoint's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

135. During the Class Period, Checkpoint's securities were traded on an active and efficient market. Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Checkpoint's securities at prices artificially inflated by defendants' wrongful conduct. Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true value of Checkpoint's securities was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class. The market price of Checkpoint's securities

declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

136. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

137. As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

138. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

139. During the Class Period, the Individual Defendants participated in the operation and management of Checkpoint, and conducted and participated, directly and indirectly, in the conduct of Checkpoint's business affairs. Because of their senior positions, they knew the adverse non-public information about Checkpoint's misstatement of income and expenses and false financial statements.

140. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Checkpoint's financial condition and results of operations, and to correct promptly any public statements issued by Checkpoint which had become materially false or misleading.

141. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Checkpoint disseminated in the marketplace during the Class Period concerning Checkpoint's operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Checkpoint to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Checkpoint within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Checkpoint's securities.

142. Each of the Individual Defendants, therefore, acted as a controlling person of Checkpoint. By reason of their senior management positions and/or being directors of Checkpoint, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Checkpoint to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised

control over the general operations of Checkpoint and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

143. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Checkpoint.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff demands judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B. Requiring defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Lead Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Lead Plaintiff hereby demands a trial by jury.

Dated: April 4, 2016

**LEVI KORSINSKY LLP**

s/ Eduard Korsinsky
Eduard Korsinsky (EK-8989)
235 Main Street
Hackensack, New Jersey 07601
Tel.: (973) 265-1600
Fax: (212) 363-7171
Email: ek@zlk.com

-and-

Nicholas I. Porritt
Adam M. Apton
Adam McCall
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com
Email: aapton@zlk.com
Email: amccall@zlk.com

(*Pro hac vice to be submitted*)

*Attorneys for Lead Plaintiff and Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I, Eduard Korsinsky, hereby certify that on April 4, 2016, I authorized the electronic filing of the foregoing complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

/s/ Eduard Korsinsky
Eduard Korsinsky

4841-9922-5903, v. 3